Filed 12/16/15  P. v. Vibanco CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ORLANDO KEN VIBANCO,<br><br>Defendant and Appellant. | F068171<br><br>(Fresno Super. Ct. No. F10905397)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  James Petrucelli, Judge.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant Orlando Ken Vibanco was charged and convicted of robbery and battery, and sentenced to the third strike term of 25 years to life, after he beat and robbed a man who had given a ride to defendant and his female companion. On appeal, defendant contends the court should have excluded his pretrial statements because they were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); his trial testimony should not have been impeached with his prior convictions for burglary and robbery; and the unanimity instruction should have been given for the robbery count. We affirm.

## FACTS

On the night of October 24, 2010, Gabriel Ocon (Ocon) walked out of the FoodMaxx store near Highway 99 and Fresno Street and headed to his car in the parking lot. Defendant and Netisha Embry (Embry) approached him and defendant asked for a ride. Ocon did not know them and had never seen them before.

Ocon testified defendant spoke to him in "[n]ot so good Spanish" and asked for a ride to some place on Jensen. Ocon said no. Defendant insisted and said Embry had cancer, and she could not walk. Ocon finally agreed because defendant said Embry was sick. Embry did not ask for the ride or say anything to him.

Ocon got into the driver's seat of his two-door car. Defendant entered the car through the passenger door and sat in the rear passenger seat. Embry sat in the front passenger seat.

Ocon testified that he had placed a full-size pool cue in the car, which was lying lengthwise between the center console and the front passenger seat. He did not have any real or fake firearms in the vehicle.

Ocon testified defendant said they wanted to go to Golden State and Jensen. Ocon drove south on Golden State. When he reached Jensen, defendant said the place was not

2.

there and they should go further. Defendant told Ocon to turn onto "North Street,"[1] but defendant never said exactly what he was looking for. Ocon drove to North Avenue, but defendant again failed to explain where he wanted to go. Defendant never told Ocon that he was going the wrong way.

As Ocon was driving around, defendant asked to borrow Ocon's iPhone. He did not say why he wanted it. Ocon passed his iPhone to defendant in the back seat. He did not see defendant use it.

Ocon started to become suspicious of the situation. Ocon decided to get on to northbound Highway 99 and head back to Jensen Avenue. He intended to drop off defendant and Embry at Jensen and Golden State, as defendant originally requested.

Ocon told defendant to return his iPhone. Defendant claimed he placed it on the center console, and then acted like he was looking for it in the backseat. Ocon believed defendant hid the iPhone or put it in his pocket.

**Defendant Attacks Ocon**

Ocon turned off Highway 99 at Jensen Avenue. There were several fast food restaurants nearby, but Ocon did not think to drive into the well-lighted parking lot. Instead, he stopped on the side of the street by the highway embankment. Ocon again told defendant to return his iPhone. Defendant did not do so.

Ocon testified defendant told him to get out of the car. Defendant began to hit Ocon in the face and head. Ocon tried to defend himself and turned around and grabbed defendant's hands. Defendant grabbed the pool cue and repeatedly hit Ocon's head with it. The stick broke into two pieces.

As Ocon struggled with defendant, Embry got out of the passenger door. Defendant continued to beat Ocon with one piece of the pool cue. At some point, both

---

[1] It is noted that there is no North "Street" in the vicinity of Golden State or Jensen Avenue in Fresno County. The only roadway referred to as "North" is North Avenue.

3.

defendant and Ocon got out of the car through the passenger door. Ocon testified he might have used part of the pool stick to hit defendant.

Ocon testified that as defendant beat him, defendant told Embry to get Ocon's key from the car. Ocon was not sure if she took the key because he was preoccupied with defendant.

Ocon testified he punched defendant with his elbow and defendant fell down. Ocon assumed Embry had already taken his car key from the ignition. Ocon kept his extra car key in his wallet, and intended to retrieve it so he could escape in the car. While defendant was on the ground, Ocon pulled out his wallet, which also contained his identification and $200. As he looked for the key, defendant got up and hit Ocon in the head. Ocon testified he did not remember what happened after that, until he woke up in an ambulance.

**The Police Find Ocon**

The police received a call from patrons at the nearby fast food restaurants about a possible robbery at Highway 99 and Jensen. When the officers arrived at the Jensen offramp, Ocon was sitting on the ground next to his car. He was disheveled. Ocon was bleeding and his shirt was covered with blood. He had swelling, cuts, and bruises to his face.

Officer Zavalza spoke to Ocon and heard his account of giving a ride to the man and woman. Ocon said the man attacked him in his car. Ocon also said that he grabbed the pool cue to protect himself, but defendant took it away and beat Ocon with it.

The police searched the area around Ocon's car and found his car key, one piece of the broken pool cue, and his wallet. The wallet contained his identification, but there was no money. The police found the other half of the broken pool cue inside the car, on the driver's side of the backseat. They also found a replica toy handgun in the car, on the back floorboard behind the passenger seat. The police showed the broken pool cue to Ocon, who said defendant hit him with the stick.

4.

**Defendant's Statements**

While officers spoke to Ocon and obtained medical assistance for him by the off ramp, additional officers responded to the nearby fast food restaurants based on the dispatch that a man and women were walking away from the area. Sergeant Cancio saw defendant and Embry walking around one of the restaurants. He drove behind them and asked them to stop. They complied and were cooperative. Cancio did not notice any injuries on either defendant or Embry. Embry said she had cancer.

Officer Bunch arrived at the parking lot and found defendant and Embry sitting on the ground near one of the restaurants. Officer Cancio was standing near them. Bunch testified it was "pretty clear" defendant had been involved in a physical altercation because he was sweating and there was blood on his shirt. Defendant did not have any visible injuries to his face or hands.

Officer Bunch testified the officers were trying to piece together what happened at the two locations. Embry complained of pain on her side, and said Ocon had assaulted her. Bunch asked Embry if she needed and ambulance, and she said yes.

Officer Bunch testified that defendant "began to explain to us what had occurred." Defendant said they had been at the FoodMaxx parking lot, and they needed a ride to a motel. Defendant said they got a ride from Ocon, but he became "creepy," drove past their motel, and headed into the "outskirts" of the country. Defendant saw a pool cue in the car, and he was going to grab it, but Ocon took it away. Defendant said Ocon grabbed Embry's hair. Defendant said he struggled with Ocon to release Embry. Ocon hit defendant with the pool cue. Defendant said Ocon stopped the car, and an unknown, black male arrived and rescued them from Ocon. Defendant and Embry walked away from Ocon's car. Defendant said they were getting away from Ocon when the police arrived.

**Discovery of the iPhone**

Officer Bunch searched defendant and found an iPhone in his pocket. Bunch said, "Oh, you have an iPhone." Defendant said yes. Bunch placed it on the restaurant's windowsill and it fell down. Bunch apologized, and defendant said no problem. Bunch asked defendant why he did not immediately call 911 on his iPhone for help. Defendant said the iPhone was not activated.

Officer Bunch also found two small pieces of plastic in defendant's pocket. The two pieces were later matched to the replica toy handgun found in the backseat of Ocon's car.

The officers called Ocon's iPhone number. The iPhone which they found in defendant's pocket started to ring. Defendant heard the iPhone ring, and he "blurted out, 'that's his phone.' " Officer Bunch asked what he meant. Defendant said the iPhone belonged to the man who hit him with the pool cue.[2]

**Identification of the Suspects**

Ocon was treated at the scene by emergency personnel. Ocon testified that he recalled being taken to the parking lot of the fast food restaurant for an infield showup. Officer Cancio testified Ocon immediately identified defendant and Embry as the two people who were in his car, and defendant as the person who assaulted him.

After Ocon identified defendant, Officer Zavalza advised defendant of the *Miranda* warnings and asked him about the incident. Defendant said he was in the supermarket parking lot with Embry, and Embry asked Ocon for a ride. Defendant again said Ocon "wouldn't turn on the streets that they were telling him to turn, so they drove around for several minutes until they ended up northbound [on Highway] 99 at the Jensen … off-ramp …." Defendant said he asked to use Ocon's iPhone so he could look up the

---

[2] As we will discuss in issue I, *post*, defendant contends he was subject to custodial interrogation during this sequence of events, *Miranda* warnings should have been given, and his statements should have been excluded.

motel's address. Defendant said Ocon was acting "weird" and "trying to grab on to Embry." Defendant said Ocon took the Jensen off ramp and stopped the car. Ocon turned around and began hitting defendant.

Officer Zavalza testified he had already seen the multiple injuries on Ocon's face, and asked defendant if he hit Ocon. Defendant replied that he just "blocked" Ocon's punches, and said he did not hit or touch Ocon. Zavalza asked defendant to explain how Ocon received his multiple injuries. Defendant did not respond to this question. Zavalza asked defendant whether he hit Ocon with the pool cue; defendant did not respond. Zavalza also asked defendant why Ocon's wallet was found on the street by his car, and defendant again failed to respond.

The officers did not see any injuries on defendant that would have been consistent with being hit with a pool cue. Defendant did not require any medical assistance, and he was not taken to the hospital.

Ocon was taken to the hospital and remained there for three days. He suffered multiple open cuts, abrasions, and bruises to his eyes, nose, chin, head, hands, and chest. Some of the cuts required stitches and left scars. While he was at the hospital, the officers returned his iPhone, car keys, and wallet. His wallet still contained his identification and the extra car key, but the $200 was missing and was never recovered.

### DEFENDANT'S TRIAL TESTIMONY

At trial, defendant testified and again claimed that Ocon attacked him and Embry. Defendant testified that on the day of the incident, he was visiting his friend Darcy, who lived at either the Fresno Inn or the Motor Lodge. As he left Darcy's motel room, Embry arrived in a car driven by an older man. Defendant thought she was attractive and "hollered" at her. Embry was wearing "sexy" clothes and said she was a dancer. Defendant thought another friend would be interested in having Embry dance for him. Embry agreed to meet his friend. Defendant got into the car with Embry and the older man, who drove them to the friend's house on G Street. Defendant and Embry went into

7.

the friend's house. Embry did "a little thing" with the friend, and they scheduled something for another time because the friend's wife was in the house.

Defendant testified they walked out of his friend's house and discovered Embry's driver had left. Defendant felt responsible for Embry because he had invited her into a bad neighborhood. They walked toward FoodMaxx to look for a ride. Embry said she could not walk any further, her stomach hurt, and she had cervical cancer.

Defendant approached people in the parking lot and asked for ride, but they said no. Defendant saw Ocon and told Embry that she should ask for a ride because everyone else was telling him no. Embry asked Ocon for a ride. Ocon replied in Spanish, and defendant realized that he did not speak English. Defendant walked over and asked Ocon for a ride in "not very good Spanish." Ocon did not seem sure about it. Defendant told Ocon that Embry was sick and Ocon agreed.

Defendant testified he asked Ocon to take them to the Fresno Inn or Motor Lodge motel, and gave him directions to "one of those two motels." Ocon drove in the opposite direction. Defendant told Ocon that he was going the wrong way. Ocon kept driving south and ended up on Golden State.

Defendant testified Ocon began to act "creepy" and "weird" because he would not respond to defendant. Ocon drove through dark areas and stopped the car three times. Defendant again told Ocon they were going the wrong way, but Ocon did not respond. Embry "scooted" towards the door and asked what he was doing. Defendant replied that he did not know. Defendant became scared and did not know what Ocon was going to do. Defendant noticed Ocon was looking at a map on his iPhone.

Defendant testified Ocon was driving around dark streets, and then he turned onto northbound Highway 99. Defendant told him to turn on Jensen and leave them at the fast food restaurants. Defendant asked to borrow Ocon's iPhone so he could see the map that Ocon was looking at. Defendant also thought he could use the phone to call the police if Ocon "did some weird stuff like went crazy or something on us."

8.

Ocon gave the iPhone to defendant, but defendant did not know how to use the map feature or place a call. Defendant placed Ocon's iPhone on the center console. It fell onto the floorboard of the backseat. Defendant picked up the iPhone and put it in his pocket. As he did so, defendant "accidentally" picked up pieces of plastic from the backseat, which were later matched to the toy gun.

Defendant testified he saw the pool cue and asked Ocon about it. Ocon became "more aggressive" and shoved it deeper between the seats. Defendant became "scared for my life."

Ocon stopped the car and asked defendant what they were going to give him for the ride. Defendant assumed Ocon was referring to Embry, and said, "[D]ude, that's not happening." Defendant told Embry to get out of the car. Ocon grabbed the pool cue and hit defendant's head with the stick while defendant was still inside the car. Defendant tried to block the blows with his arms and the cue broke. Ocon crawled into the backseat and got on top of defendant. Embry ran to the driver's door and tried to pull Ocon off defendant. The car engine was still running, so she removed the key from the ignition.

Defendant testified Ocon stopped wrestling with him, and pulled Embry's hair and necklace. Defendant pulled Ocon and Embry apart. Embry ran from the car and screamed for help. Defendant tried to get out of the backseat, but Ocon grabbed his shirt. Defendant managed to get out of the car, but Ocon held onto him.

Defendant and Ocon faced each other outside the car, and they were still "tussling." Ocon used half of the pool cue and hit defendant's head. "I'm fighting for my life and he's trying to kill me or whatever with that pool stick." Defendant testified he never punched Ocon with his fists, but he again blocked the blows with his arms and tried to take away the pool cue.

Defendant testified that as he tried to protect himself, Ocon jumped on his back and choked him. Defendant bit Ocon's finger, but Ocon would not let him go.

Defendant used the back of his head to "head butt" the front of Ocon's face three or four times.

Defendant testified he and Embry were screaming for help. An African-American man arrived and told Ocon to get off defendant. Ocon ignored the man and kept choking defendant. The man pulled Ocon off defendant's back. Ocon turned and hit the man with the pool cue. Defendant and Embry ran to the fast food restaurants because another bystander said the police were on the way.

Defendant admitted the police found Ocon's iPhone in his pocket. Defendant said he never told the police that the iPhone belonged to him. Defendant testified he told the officer that he did not know how to use it to call for help, but the officer would not listen to him. Defendant did not know how Ocon's wallet ended up on the street.

Defendant believed Ocon received the injuries to his face when Ocon was on his back and he butted Ocon's face with the back of his head. He thought Ocon received the bruises on his chest when they were "in the scuffle in the car." Defendant believed the blood on the back of his shirt was from Ocon's hands.

Defendant was impeached with his prior felony convictions for attempted robbery in 1989, second degree burglary in 1991, and robbery in 2005.

**Verdict and Sentence**

After a jury trial, defendant was convicted as charged of second degree robbery (Pen. Code, § 211),[3] with a great bodily injury enhancement (§ 12022.7, subd. (a)); and battery with serious bodily injury (§ 243, subd. (d)). He admitted he had two prior strike convictions and served four prior prison terms.[4]

---

[3] All further statutory references are to the Penal Code unless otherwise stated.

[4] Defendant and Embry were initially jointly charged with second degree robbery. Prior to defendant's trial, Embry pleaded no contest to being an accessory to a felony (§ 32), and she was sentenced to 16 months in jail.

Defendant was sentenced to the third strike term of 25 years to life for count I; plus three years for the great bodily injury enhancement; and four one-year terms for the prior prison term enhancements.

## DISCUSSION

### I.  ADMISSION OF DEFENDANT'S STATEMENTS

Defendant contends the court should have granted his motion to exclude the pretrial statements he made at the scene because he was subject to custodial interrogation in the absence of the *Miranda* warnings.  Defendant asserts he was in custody when Officer Bunch spoke to him, Bunch's remarks about the iPhone constituted both the direct and the functional equivalent of interrogation, and *Miranda* warnings should have been given.

#### A.  Custodial Interrogation

We begin with the well settled principles regarding custodial interrogation.  The advisement of the *Miranda* warnings is only required when a person is subject to custodial interrogation.  Custodial interrogation has two components.  First, the person being questioned must be in custody.  (*People v. Mickey* (1991) 54 Cal.3d 612, 648 (*Mickey*); *People v. Mosley* (1999) 73 Cal.App.4th 1081, 1088 (*Mosley*).)  "Custody, for these purposes, means that the person has been taken into custody or otherwise deprived of his freedom in any significant way.  [Citation.]"  (*Mosley, supra,* 73 Cal.App.4th at p. 1088.)

The second *Miranda* component "is obviously interrogation."  (*Mosley, supra,* 73 Cal.App.4th at p. 1089.)  "For *Miranda* purposes, interrogation is defined as any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response.  [Citation.]"  (*Ibid.*)

"Absent 'custodial interrogation,' *Miranda* simply does not come into play. [Citations.]"  (*Mickey, supra,* 54 Cal.3d at p. 648.)  "Just as custodial interrogation can occur in the absence of express questioning [citation], *not all questioning of a person in*

11.

*custody constitutes interrogation under Miranda.* [Citations.]" (*People v. Ray* (1996) 13 Cal.4th 313, 338, italics added.) In addition, spontaneous or volunteered statements are not the products of interrogation, and are not barred by the Fifth Amendment or subject to the requirements of *Miranda.* (*Miranda, supra,* 384 U.S. at p. 478; *Rhode Island v. Innis* (1980) 446 U.S. 291, 299–300; *People v. Ray, supra,* 13 Cal.4th at p. 337.) A police officer is not obligated to prevent a suspect from volunteering incriminating statements. (*People v. Edwards* (1991) 54 Cal.3d 787, 816.)

"In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained. [Citations.]" (*People v. Smith* (2007) 40 Cal.4th 483, 502.) We apply federal standards in reviewing a defendant's claim that a challenged statement was obtained in violation of *Miranda.* (*People v. Bradford* (1997) 14 Cal.4th 1005, 1043.)

The erroneous admission of a statement obtained in violation of *Miranda* is reviewed under the harmless error standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 309–310; *People v. Cunningham* (2001) 25 Cal.4th 926, 994.)

With these guidelines in mind, we turn to the evidence in this case.

## B. Background

Defendant moved to exclude the statements he made at the scene to Officer Bunch, and argued he was in custody, and Bunch should have advised him of the *Miranda* warnings. The court conducted an evidentiary hearing on the motion. Bunch was the only witness; defendant did not testify.

Officer Bunch testified he responded to the parking lot of Wendy's restaurant on Jensen around 10:30 p.m. Defendant and Embry were sitting on a curb. Bunch testified that Sergeant Cancio had "detained" defendant and Embry. They were not wearing

12.

handcuffs. Bunch did not know if anyone told defendant that he was not free to leave. Bunch testified that defendant appeared to have been in an altercation because he was sweating and had some blood on his shirt.

Officer Bunch testified the officers were trying to determine what happened:

"[T]he scene was still, I guess, in progress. You had multiple scenes or you had a scene where officers were at a vehicle [with Ocon] and then you had us with [defendant at the restaurant] …, and we were still trying to piece together what was occurring. I believe [Embry] was describing that she was injured. So we didn't know if we had victims or suspects at that point."

Officer Bunch testified he was standing next to defendant. He did not advise defendant of the *Miranda* warnings. Sergeant Cancio and Officer Roby were a few feet away; they did not ask defendant any questions.

Officer Bunch looked at defendant's hands "to see if he had any injuries, but I didn't ask him any questions."

"Q.    At some point did he start talking to you?

"A.    Yes.

"Q.    But not in a response to any questions on your part?

"A.    No."

Officer Bunch testified that defendant "began to explain what had occurred" with Ocon. Defendant said he and Embry were at FoodMaxx, and they needed a ride. Ocon gave them a ride, and he "became creepy."

"Q.    During this conversation with [defendant], are you asking him questions?

"A.    No. He's pretty much just letting it—just explaining what had happened on his side.

"Q.    Okay. Are you asking any follow-up questions to the things he's saying, or just letting him go?

13.

"A.     *I think at one point I caught him in just kind of contradicting statements, but I didn't further ask him questions because I knew there was—that it was starting to lean towards him as a possible suspect as opposed to being a victim, and then, you know, there was no questioning. So, no, I don't believe I asked him any questions.  It was all him giving his side of what had occurred.*"  (Italics added.)

After defendant made his statement, Officer Bunch searched defendant and found an iPhone in his pocket.  Bunch testified:

"*I think I actually said, oh, you have an iPhone, and then he had said something about—or replied, yeah.*  I then had placed—I remember placing that iPhone on the windowsill of the Wendy's so instead of holding it while I continued my search.  The phone dropped and I remember him saying something about breaking his iPhone or hopefully his iPhone is not broken, some kind of comment about the iPhone.  *And then I think I had asked him why he didn't call the police on his phone regarding this incident that he was describing, and he said that he had no minutes or something like that, or it wasn't activated yet.*"  (Italics added.)

Officer Bunch did not testify about any additional facts at the hearing.  He was not asked any questions about whether he knew about what Ocon told the other officers, or if he knew that Ocon's iPhone was missing.

### C.  **The Court's Ruling**

After hearing Officer Bunch's testimony, the court denied defendant's motion to exclude his pretrial statements.  The court held "it was clear that *Miranda* was not necessary.  It was also clear from the officer's testimony that there was no questioning taking place and that these were voluntary spontaneous statements, and they will be allowed in."

### D.  **Investigatory Detention**

Defendant contends he was not free to leave, and he was in custody when the officers stopped him at the fast food restaurant, and Officer Bunch interrogated him in the parking lot.  Defendant argues the entirety of his statements at the scene should have been excluded for being obtained in violation of *Miranda*, and the error was not harmless.

14.

As explained above, however, the advisement of the *Miranda* warnings is only required when a person is subject to custodial interrogation. (*Mickey, supra,* 54 Cal.3d at p. 648; *Mosley, supra,* 73 Cal.App.4th at p. 1088.) The first question is whether defendant was in custody. The test for whether an individual is in custody is objective, i.e., " '[was] there a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' [Citations.]" (*Thompson v. Keohane* (1995) 516 U.S. 99, 112; see also *People v. Stansbury* (1995) 9 Cal.4th 824, 830; *People v. Ochoa* (1998) 19 Cal.4th 353, 401.)

Where no formal arrest has taken place, we must determine "whether a reasonable person in defendant's position would have felt he or she was in custody…." (*People v. Stansbury, supra,* 9 Cal.4th at p. 830.) "Custody determinations are resolved by an objective standard: Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest? [Citations.] The totality of the circumstances surrounding an incident must be considered as a whole. [Citations.] Although no one factor is controlling, the following circumstances should be considered: '(1) [W]hether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of questioning.' [Citation.] Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview. [Citation.]" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403–1404.)

"A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a

reasonable man in the suspect's position would have understood his situation."
(*Berkemer v. McCarty* (1984) 468 U.S. 420, 442, fn. omitted; *People v. Stansbury, supra,* 9 Cal.4th at p. 830.) "An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. [Citation.]" (*Stansbury v. California* (1994) 511 U.S. 318, 325.)

A custodial interrogation which triggers the requirement for *Miranda* advisements, however, must be distinguished from an investigatory detention. (*People v. Farnam* (2002) 28 Cal.4th 107, 180–181.) A person who is temporarily detained and subject to investigatory questioning is not necessarily in custody for purposes of *Miranda.* (*Berkemer v. McCarty, supra,* 468 U.S. at pp. 438–440; *People v. Farnam, supra,* 28 Cal.4th at p. 180; *People v. Rivera* (2007) 41 Cal.4th 304, 309; *People v. Forster* (1994) 29 Cal.App.4th 1746, 1754.)

"[T]he term 'custody' generally does not include 'a temporary detention for investigation' where an officer detains a person to ask a moderate number of questions to determine his identity *and to try to obtain information confirming or dispelling the officer's suspicions.* [Citation.]" (*People v. Farnam, supra,* 28 Cal.4th at p. 180, italics added; *Berkemer v. McCarty, supra,* 468 U.S. at p. 439.)

Moreover, while the term "interrogation" refers to any words or actions on the part of police that are reasonably likely to elicit an incriminating response, it does not extend to inquiries "essentially 'limited to the purpose of identifying a person found under suspicious circumstances or near the scene of a recent crime[.]' [Citation.]" (*People v. Clair* (1992) 2 Cal.4th 629, 679–680 (*Clair*); *People v. Farnam, supra*, 28 Cal.4th at p. 180.) Indeed, *Miranda* itself held that "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.... In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." (*Miranda, supra,* 384 U.S. at pp. 477–478, fn. omitted.)

"[T]here is no hard and fast line to distinguish permissible investigative detentions from impermissible de facto arrests.  Instead, the issue is decided on the facts of each case, with focus on whether the police diligently pursued a means of investigation reasonably designed to dispel or confirm their suspicions quickly, using the least intrusive means reasonably available under the circumstances.  [Citations.]"  (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 384–385.)

For example, in *Clair*, *supra*, 2 Cal.4th 629, several police officers were dispatched to an apartment to investigate a reported burglary.  A rear kitchen window revealed signs of entry.  An officer knocked, announced he was a police officer, and received no response.  The officers were admitted into the apartment by the building manager.  The defendant was under the covers in a bed in the bedroom.  An officer approached the defendant with gun drawn and ordered him not to move.  The officer asked the defendant who he was, if he had identification, and if he lived there.  The defendant gave a false name and admitted he did not live there.  The officer asked the defendant what he was doing there.  The defendant said he had spent the previous night with a woman who lived in the apartment.  The officer determined the resident did not know the defendant and arrested him for burglary.  (*Id.* at pp. 648–649.)

*Clair* held the defendant was not in custody and the incident was the type of " '[g]eneral on-the-scene questioning as to facts surrounding a crime' " that did not trigger the requirement for *Miranda* warnings.  (*Clair, supra,* 2 Cal.4th at p. 679.)  The defendant was only subject to "a temporary detention for investigation," and the officer "did no more than was permitted" to determine why the defendant was in that particular location.  (*Ibid.*)  The officer's decision to draw his gun was "altogether reasonable under the circumstances" and did not raise the detention to a custodial situation.  (*Ibid.*)

*Clair* also held the defendant was not subject to "interrogation." (*Clair, supra,* 2 Cal.4th at p. 679.)

17.

"To be sure, the term ' "refers not only to express questioning, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." ' [Citation.]  But it apparently does not extend to 'inquiries'—like those here—that are essentially 'limited to the purpose of identifying a person found under suspicious circumstances or near the scene of a recent crime[.]' [Citation.]"  (*Id.* at pp. 679–680; see also *People v. Forster*, *supra*, 29 Cal.App.4th at pp. 1753–1754.)

### E. <u>Analysis</u>

As demonstrated in the cases discussed above, defendant was not in custody, only subject to an investigative detention for a limited period as the officers tried to find out what happened, and *Miranda* warnings were not required.  Officer Bunch testified the police were trying to determine what happened between Ocon, defendant and Embry, and they were not sure which parties were victims or assailants.

As they tried to sort out of the situation, defendant was not placed in handcuffs; he was not arrested; none of the officers had drawn their weapons; he was not placed in a patrol car; and the record strongly implies the detention was brief and occurred immediately upon the officers' arrival at the scene.  Defendant was questioned in a public area, "a significant difference from interrogation at the police station, 'which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek.'  [Citation.]"  (*People v. Pilster*, *supra*, 138 Cal.App.4th at p. 1404; *People v. Davidson* (2013) 221 Cal.App.4th 966, 972.)

As in *Clair*, defendant was subject to an investigatory detention and *Miranda* warnings were not required for the brief questions at the scene.  Even if defendant was in custody, however, we also find defendant was not subject to an interrogation.  It is undisputed that defendant voluntarily tried to explain the situation.  Defendant immediately tried to control the narrative of the incident by describing how Ocon was the aggressor and they were the victims.

Defendant asserts Officer Bunch conducted an interrogation and asked him direct questions. This argument is based on defendant's interpretation of Bunch's testimony at the evidentiary hearing, that he asked defendant follow up questions when he caught defendant making contradictory statements about the incident. Defendant's interpretation of the record is refuted by the entirety of Bunch's testimony at the evidentiary hearing:

> "I think at one point I caught him in just kind of contradicting statements, but I didn't further ask him questions because I knew there was—that it was starting to lean towards him as a possible suspect as opposed to being a victim, and then, you know, *there was no questioning. So, no, I don't believe I asked him any questions. It was all him giving his side of what had occurred*." (Italics added.)

While Bunch considered asking defendant follow up questions about the contradictions, the entirety of his testimony shows he did not do so, and defendant continued to give his own side of the story without interruption. There was no evidence to contradict Bunch's testimony on this point.

Defendant further asserts he was subject to both direct questioning and the functional equivalent of interrogation when Officer Bunch conducted the patdown search, found the iPhone in defendant's pocket, commented, "[O]h, you have an iPhone," and asked defendant why he did not use the iPhone to call the police. Defendant points to a statement made by the prosecutor in closing argument at trial, that the radio dispatch about the incident described it as a robbery and mentioned a phone. Defendant argues that Bunch likely heard that dispatch, and he knew the significance of defendant's possession of an iPhone when he asked about it, such that his statements about the iPhone were reasonably likely to elicit an incriminating response.

Officer Bunch was the only witness at the evidentiary hearing, and there is no evidence that Bunch heard a specific dispatch describing a missing or stolen iPhone, or knew Ocon's iPhone was missing. Bunch testified that the officers were trying to sort out the situation at the two scenes. He was aware that officers were at a second location with

19.

Ocon and a car, but Bunch testified he responded to the fast food restaurant. There is no evidence Bunch spoke to Ocon or the officers who were with him at the car. Bunch testified he did not know whether defendant and Embry were victims or suspects. Given defendant's voluntary narrative that Ocon became creepy and was the aggressor, Bunch's comment and question were reasonably part of the investigatory detention to clarify defendant's story and determine exactly what happened and whether defendant used the iPhone to call for help. (*Clair, supra,* 2 Cal.4th at p. 679.)

Finally, defendant asserts he was subject to direct questioning based on Sergeant Cancio's *trial testimony* about the scene at the fast food restaurant, when Cancio testified that defendant was "talking to Bunch, answering the questions Bunch was asking him." Defendant contends this trial evidence undermines any interpretation of Bunch's hearing testimony that he did not ask any questions, aside from the exchange about the iPhone. However, Cancio did not testify at the evidentiary hearing on the admissibility of defendant's statements. There was no evidence introduced at that hearing to refute Bunch's testimony that he did not ask any questions aside from the clarifying remarks about the iPhone.

Even if Sergeant Cancio's trial testimony was considered, however, it is consistent with the brief exchange between Bunch and defendant about the iPhone. As we have already explained, however, defendant was not in custody, and *Miranda* warnings were not required during the brief investigative detention.

We conclude defendant was not in custody, he was subject to an investigatory detention; the *Miranda* advisements were not required; and his pretrial statements were properly admitted.[5]

---

[5] We note that statements obtained in violation of *Miranda* are admissible for impeachment purposes if the defendant chooses to testify, unless defendant's statements are involuntary. (*Mincey v. Arizona* (1978) 437 U.S. 385, 398; *People v. May* (1988) 44 Cal.3d 309, 318; *People v. Peevy* (1998) 17 Cal.4th 1184, 1193; *People v. Cannata* (2015) 233 Cal.App.4th 1113, 1121.) "A statement is involuntary [citation] when, among

## II. THE COURT PROPERLY PERMITTED IMPEACHMENT OF DEFENDANT'S TESTIMONY WITH HIS PRIOR CONVICTIONS

Defendant next contends the court abused its discretion when it denied his motion to prevent the prosecution from impeaching his trial testimony with his prior felony convictions. Defendant argues the prior convictions should have been excluded for being too similar to the charged offense of robbery; they were too old; and the court failed to balance the probative value against the prejudicial impact of the evidence.

### A. **Background**

Prior to trial, defendant moved to bar the prosecution from impeaching his prospective trial testimony with his prior felony convictions for attempted robbery in 1989, burglary in 1991, and robbery in 2005. Defendant conceded these offenses were crimes of moral turpitude, but argued that they should be excluded because the prior convictions were old and too similar to the charged crime.

The entirety of defendant's record showed that in 1989, he was convicted of felony attempted robbery (§§ 664/211) and sentenced to three years in prison. He was released on parole in 1990.

In 1991, defendant was convicted of felony burglary and sentenced to three years in prison. He was released on parole, violated parole and returned to prison, and paroled in 1995.

In 1994, defendant was convicted of felony possession of methamphetamine with prior convictions, and sentenced to five years in prison. He was paroled in 1999, violated parole and returned to prison, and discharged from parole in 2003.

___

other circumstances, it 'was " 'extracted by any sort of threats ..., [or] obtained by any direct or implied promises, however slight ....' " ' [Citations.]" (*People v. Neal* (2003) 31 Cal.4th 63, 79.) Defendant has never claimed that his pretrial statements were involuntary; his arguments have been limited to whether he was subject to custodial interrogation and *Miranda* warnings should have been given. There is no evidence in this record that any type of coercion occurred while the officers spoke to defendant in the parking lot. Thus, even if defendant's statements were obtained in violation of *Miranda*, they were still admissible to impeach his trial testimony.

In 2005, defendant was convicted of robbery and sentenced to prison.

The first amended information alleged that defendant's convictions for attempted robbery and robbery were prior strike convictions. It also alleged that the convictions for attempted robbery in 1989, burglary in 1991, possession of narcotics in 1995, and robbery in 2005, were the basis for section 667.5, subdivision (b) prior prison term enhancements, in that he served a term in prison for each offense and did not remain free from custody and committed another felony offense during the five-year period subsequent to each conviction.

## B. Motion to Exclude Convictions

At trial, the court and the parties discussed in chambers which prior convictions were admissible to impeach defendant if he decided to testify. On the record, defense counsel argued the prior convictions should be excluded because they were too old and too similar to the charged offense.

The prosecutor acknowledged the attempted robbery conviction was from 1989, but argued it could be used for impeachment since it was "still a valid prison prior," it had not "washed out" under the provisions of section 667.5, subdivision (b), and it was fairly probative for impeachment. Defense counsel suggested that the court only permit impeachment with one of the robbery convictions instead of both of them.

The court stated that it had already excluded defendant's prior conviction for possession of narcotics, but held defendant could be impeached with the prior convictions for robbery, attempted robbery, and burglary because they were "highly probative and show[ed] a pattern of behavior."

## C. Admissibility of Prior Convictions

Article I, section 28, subdivision (f) of the California Constitution authorizes for impeachment purposes "the use of any felony conviction which necessarily involves moral turpitude," subject to the trial court's exercise of discretion under Evidence Code section 352. (*People v. Castro* (1985) 38 Cal.3d 301, 306.) " 'No ... defendant who

22.

elects to testify in his own behalf is entitled to a false aura of veracity.' [Citation.]" (*People v. Tamborrino* (1989) 215 Cal.App.3d 575, 590.)

Robbery, attempted robbery, and burglary are crimes of moral turpitude. (*People v. Gray* (2007) 158 Cal.App.4th 635, 641; *People v. Collins* (1986) 42 Cal.3d 378, 395; *People v. Dillingham* (1986) 186 Cal.App.3d 688, 695.) A defendant's prior convictions for robbery, burglary, and other theft-related offenses "are probative on the issue of the defendant's credibility. [Citations.]" (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 925.)

" '[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude. Beyond this, the latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad.' [Citations.] When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify. [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 931.)

"A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

**D. Analysis**

Defendant renews the arguments he made at trial and asserts his prior convictions for attempted robbery in 1989 and burglary in 1991 should have been excluded because they were too remote since they occurred 24 and 22 years, respectively, before the instant trial. Defendant acknowledges he had intervening parole violations, but argues those

violations only slightly enhanced the probative value of the prior convictions for impeachment purposes.

"If a prior felony conviction has been followed by a legally blameless life, remoteness is important. [Citation.] Thus, the court may consider defendant's conduct subsequent to the prior conviction. [Citations.]" (*People v. Tamborrino, supra,* 215 Cal.App.3d at p. 590.) "[C]onvictions remote in time are not automatically inadmissible for impeachment purposes. Even a fairly remote prior conviction is admissible if the defendant has not led a legally blameless life since the time of the remote prior. [Citations.]" (*People v. Mendoza, supra,* 78 Cal.App.4th at pp. 925–926.) For example, in *People v. Green* (1995) 34 Cal.App.4th 165, the court admitted a 20-year-old prior conviction because "his 1973 conviction was followed by five additional convictions in the years 1978, 1985, 1987, 1988, and 1989. Accordingly, 'the systematic occurrence of [the defendant's] priors over a 20-year period create[d] a pattern that [was] relevant to [his] credibility.' [Citation.]" (*Id.* at p. 183.)

Defendant did not lead a legally blameless life after committing the 1989 and 1991 offenses based on his numerous parole violations and subsequent offenses, and his prior convictions were not so remote as to preclude their relevance for impeachment. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1055–1056 [17-year-old conviction not too remote]; *People v. Muldrow* (1988) 202 Cal.App.3d 636, 647–648 [20-year-old conviction not too remote].) Defendant testified knowing that he would be impeached with his convictions. This further supports the trial court's decision to admit the evidence. (*People v. Carpenter, supra*, 21 Cal.4th at p. 1056; *People v. Clarida* (1987) 197 Cal.App.3d 547, 554.)

Defendant next argues his three theft-related offenses were not highly probative of moral turpitude compared to offenses such as perjury. In support of this argument, he relies on *People v. Fries* (1979) 24 Cal.3d 222 (*Fries*), which held:

24.

"[A] conviction for robbery is only partly relevant to credibility, because '[robbery] is a crime which is both larcenous and assaultive, and thus bears *in part* on the perpetrator's integrity and veracity.' [Citation.] Moreover, as this court recently reiterated in *People v. Rollo* [(1977) 30 Cal.3d 109], convictions for theft offenses such as 'robbery and burglary, are somewhat less relevant' on the issue of credibility than are crimes such as perjury (20 Cal.3d at p. 118) and hence are entitled to 'somewhat less' weight." (*Id.* at p. 229.)

Defendant's reliance on *Fries* is misplaced since it was decided prior to the adoption of Proposition 8 in June 1982, when the governing law on the admissibility of prior convictions for impeachment purposes was *People v. Beagle* (1972) 6 Cal.3d 441, and not *People v. Castro*, *supra*, 38 Cal.3d 301. (See, e.g., *People v. Carpenter*, *supra*, 21 Cal.4th at p. 1056.) As we have already explained, "California courts have repeatedly held that prior convictions for burglary, robbery, and other various theft-related crimes are probative on the issue of the defendant's credibility[]" and are offenses of moral turpitude. (*People v. Mendoza, supra,* 78 Cal.App.4th at p. 925.) Further, "any felony conviction evincing moral turpitude, as here, 'has some "tendency in reason" (Evid. Code, § 210) to shake one's confidence in [a witness's] honesty.' [Citation.]" (*People v. Campbell* (1994) 23 Cal.App.4th 1488, 1496, fn. omitted.)

Defendant asserts the similarity of the prior convictions to the charged offense of robbery "heavily favored" their exclusion. "Although the similarity between the prior convictions and the charged offenses is a factor for the court to consider when balancing probative value against prejudice, it is not dispositive. [Citations.]" (*People v. Clark*, *supra*, 52 Cal.4th at p. 932.) The trial court has discretion to allow use of prior convictions identical to the current charges when other factors weigh in favor of admission. (*People v. Green, supra*, 34 Cal.App.4th at p. 183; *People v. Muldrow, supra*, 202 Cal.App.3d at pp. 646–647.) We have already found the prior convictions were admissible under the other factors. The court's decision to admit all three prior convictions for impeachment was also appropriate. "There is no automatic limitation on the number of priors admissible for impeachment…." (*People v. Dillingham*, *supra*, 186

Cal.App.3d at p. 695.) "[A] series of relevant crimes is more probative of credibility than a single lapse. [Citation.]" (*People v. Hinton* (2006) 37 Cal.4th 839, 888.)

Finally, defendant contends the court erroneously admitted the prior convictions based on the incorrect legal conclusion that they were admissible to show his propensity or pattern of behavior. While the court referred to defendant's "pattern of behavior" when it held the prior convictions were admissible, it has long been the law that a correct decision made by a court for the wrong reason will not be disturbed on appeal. (*People v. Vera* (1997) 15 Cal.4th 269, 272; *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 ["No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion."].) We have already explained that defendant's three prior convictions for robbery, burglary, and attempted robbery were offenses of moral turpitude and admissible to impeach his trial testimony.

We further note that the jury was instructed pursuant to CALCRIM No. 316 as to the limited admissibility of the prior convictions: That if the jury found "a witness has been convicted of a felony, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable." In his closing argument, the prosecutor stated that the jury could rely on defendant's prior felony convictions "only in evaluating the credibility of his testimony." Defense counsel made the same argument and reminded the jury that it could not treat defendant's prior convictions as propensity evidence. We presume the jury followed the instruction and did not rely on the prior

convictions as propensity evidence.  (*People v. Little* (2012) 206 Cal.App.4th 1364, 1381.)

## II.    THE UNANIMITY INSTRUCTION

Defendant argues the court had a sua sponte duty to give the unanimity instruction as to count I, robbery, because the jury could have relied on two separate acts for robbery:  taking Ocon's iPhone, and/or taking the cash inside Ocon's wallet.  Defendant argues the error was prejudicial because the prosecutor failed to make a clear election about the basis for the robbery charge.

### A.  The Necessity for the Instruction

"In a criminal case, a jury verdict must be unanimous.  [Citations.] ... Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime.  [Citation.]  Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act.  [Citations.]  [¶]  This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.'  [Citation.]"  (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)

A prosecutorial election may be accomplished by means of opening statement and/or closing argument.  (*People v. Mayer* (2003) 108 Cal.App.4th 403, 418–419; *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1454–1455; *People v. Diaz* (1987) 195 Cal.App.3d 1375, 1382–1383.)  The court has a sua sponte duty to instruct on unanimity when no election has been made.  (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.)

"In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on *two discrete crimes* and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be

uncertain, as to the exact way the defendant is guilty of a *single discrete crime.* [Citation.] In the first situation, but not the second, it should give the unanimity instruction. [Citation.]" (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 570, italics in original.)

A unanimity instruction is not required if the evidence shows one criminal act or multiple acts in a continuous course of conduct. *(People v. Jantz* (2006) 137 Cal.App.4th 1283, 1292.)

## B. Closing Arguments

Defendant contends the prosecutor never made a clear election in his closing argument about the basis for the robbery charge. As we will explain, however, the entirety of the parties' arguments shows that an election was made.

In his initial closing argument, the prosecutor's primary focus was to assert that Ocon's account was credible compared to defendant's multiple statements. In doing so, the prosecutor addressed the elements of robbery and said that defendant took Ocon's iPhone by trickery, kept it by force, and retained it when he ran away from Ocon's car. "[Ocon] didn't give it to him, here, a gift. No, no, no. It's still his phone, give me my phone back."

The prosecutor also talked about Ocon's wallet—it was taken from Ocon after he was knocked unconscious, it was found on the side of the road, and the cash was missing. The prosecutor argued the empty wallet was found in the path defendant and Embry took between Ocon's car and the fast food restaurants, demonstrating defendant's flight from the scene.

After talking about the wallet, however, the prosecutor returned to the iPhone and cited the instruction about possession of recently stolen property, and argued the jury could rely on the inferences from that instruction based on defendant's possession of Ocon's iPhone.

"[C]ommon sense is, *if there's a robbery and he's holding the phone*, if there's a bank robbery and a guy is standing out front looking a little panicky holding a bank bag full of money, you kind of know where things are going. Supporting evidence can be slight. Put it all together, guilty of robbery." (Italics added.)

In defense counsel's closing argument, he argued Ocon had a motive to lie about the incident, and asserted defendant's account was credible and consistent with the evidence. In doing so, defense counsel noted that the prosecutor's theory of robbery might be based on the iPhone, the wallet, and the car keys, but asserted "the wallet and the car keys cannot be considered for the robbery charge because Mr. Ocon stood up there and said he did not remember who took the wallet, who took the car keys, and there was no testimony that they were ever found in any relationship to [defendant]." Defense counsel argued defendant was not guilty of robbery because Ocon voluntarily gave the iPhone to defendant, Ocon never asked for it back, and defendant did not intend to permanently deprive Ocon of the iPhone.

In his rebuttal argument, the prosecutor again attacked defendant's credibility. He discussed the possible verdict forms for count I: guilty of robbery, guilty of the lesser included offense of misdemeanor theft, or not guilty:

"No, it's robbery. The misdemeanor [lesser offense] is just the idea, well, [defendant] didn't take it by force or fear, you know, he did take the phone, he stole the phone, but, you know, he just stole it. But, no, that's silly. It really is. *If you find—you found he took the phone, then you should because of the evidence. This is what it is. It's a robbery.*" (Italics added.)

The prosecutor again mentioned Ocon's wallet in the context of arguing defendant "botched" the robbery because he did not get away with "as much as he could" and he was caught.

"[T]he wallet is *evidence* of a robbery, not the money. I don't know if Ms. Embry took it. I don't know, I wasn't there. We weren't there. What we do know is that one moment it's with Mr. Ocon. When it's found, it's not, it's on the path that they took to get away from the police. Could it have been her? Sure. *Don't care. The phone, in his pocket.*" (Italics added.)

## C. Analysis

Defendant asserts the court should have given the unanimity instruction because the prosecutor never made a clear election as to whether the robbery charge was based on taking Ocon's iPhone, his wallet, or the cash in the wallet. The entirety of the closing arguments refutes this claim and shows the unanimity instruction was not required.

Both the prosecutor and defense counsel focused on the credibility between the two conflicting stories from Ocon and defendant. While the prosecutor discussed the wallet and the missing cash, he did so as part of his claim that defendant's version of the incident was not credible since the wallet was in the path defendant and Embry took to the restaurant. The prosecutor conceded that Embry could have taken the cash, but it did not matter because the robbery charge was based on the iPhone, and the iPhone was found in defendant's pocket. "*If you find—you found he took the phone, then you should because of the evidence. This is what it is. It's a robbery*." (Italics added.)

The prosecutor made the appropriate election that the robbery count was based on the iPhone, and the unanimity instruction was not required.

## DISPOSITION

The judgment is affirmed.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
GOMES, Acting P.J.


_____
FRANSON, J.